United States Court of Appeals,

Eleventh Circuit.

No. 95-8751.

SUNAMERICA CORPORATION, a Delaware Corporation, f/k/a Sun Life Group of America, Sun Life Insurance Company of America, a Maryland Corporation, Plaintiffs-Counterdefendants-Appellants,

v.

SUN LIFE ASSURANCE COMPANY OF CANADA, a Canadian Corporation, Sun Life Assurance Company of Canada (U.S.), a Delaware Corporation, Defendants-Counterclaimants-Appellees.

March 19, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:89-CV-1315), Jack T. Camp, Judge.

Before DUBINA and CARNES, Circuit Judges, and MILLS[*], District Judge.

CARNES, Circuit Judge:

This trademark case concerns a dispute between two insurance companies over the right to use the mark SUN LIFE. The plaintiffs are SunAmerica Corporation and its wholly-owned subsidiary, Sun Life Insurance Company of America ("Sun Life of America") (collectively, "SunAmerica"). The defendants are Sun Life Assurance Company of Canada and its subsidiary, Sun Life Assurance Company of Canada (U.S.) (collectively, "Sun Life of Canada"). SunAmerica appeals from a judgment entered in favor of Sun Life of Canada on a counterclaim it brought against SunAmerica. The district court's judgment permanently enjoined SunAmerica from further use of any SUN LIFE mark.

Although Sun Life of Canada is the senior user of the SUN LIFE

---

[*]Honorable Richard Mills, U.S. District Judge for the Central District of Illinois, sitting by designation.

mark, it acquiesced in SunAmerica's use of the mark. That acquiescence would estop Sun Life of Canada from asserting its counterclaim, were it not for the existence of "inevitable confusion" in the marketplace. The existence of inevitable confusion operates to revive a senior user's claim that is otherwise estopped by acquiescence. However, we hold in this opinion that where such revival occurs, the district court must consider the feasibility and efficacy of relief other than a complete injunction against the junior user. Because the district court's order is ambiguous as to whether it adequately considered the feasibility and efficacy of alternative forms of relief, we remand the case for further proceedings.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

In June 1989, SunAmerica brought federal unfair competition and trademark infringement claims, and related state law claims, against Sun Life of Canada, alleging that Sun Life of Canada's use of the marks SUN LIFE (U.S.) and SUN LIFE, without any reference to the geographic modifier "of Canada," was causing unacceptable marketplace confusion. In response, Sun Life of Canada counterclaimed against SunAmerica for trademark infringement, seeking to enjoin SunAmerica from all use of the SUN LIFE mark. Both parties moved for summary judgment.

The district court found confusing similarity between the parties' marks. In particular, the district court found that the mark SUN LIFE (U.S.) was likely to be confused with the mark SUN LIFE OF AMERICA. Accordingly, the district court permanently enjoined Sun Life of Canada from using the mark SUN LIFE (U.S.)

without some form of the geographic modifier "of Canada."  Sun Life of Canada appealed.

On appeal, in a brief per curiam opinion, this Court held that the district court had erred by entering a permanent injunction without first resolving Sun Life of Canada's counterclaim.  We vacated the permanent injunction issued by the district court and remanded the case for consideration of that counterclaim. *SunAmerica Corp. v. Sun Life Assurance Co.,* 24 U.S.P.Q.2d 1505, 1506, 974 F.2d 1348 (11th Cir.1992) (hereinafter "*SunAmerica I* "). In a concurring opinion, Judge Birch provided not only a thorough summary of the facts and procedural history of the case through that stage, but also a detailed analytical framework to guide the parties and the district court on remand.  *Id.* at 1506-13, 974 F.2d 1348 (Birch, J., concurring).  We adopt Judge Birch's concurring opinion in its entirety as our statement of the facts and procedural history up through the time of the *SunAmerica I* decision.  We also adopt as the law of the circuit his opinion's pronouncements about the relevant law.  Because Judge Birch's concurring opinion in *SunAmerica I* has not previously been published in the Federal Reporter system, we attach that opinion and the per curiam opinion it accompanied, as an appendix to this opinion, *infra* pp. ---- - ----.

On remand after *SunAmerica I,* the district court found that Sun Life of Canada had enforceable rights in its SUN LIFE marks and that a likelihood of confusion existed between the names SUN LIFE OF AMERICA and SUN LIFE OF CANADA.  The district court also found, however, that Sun Life of Canada had acquiesced to SunAmerica's use

of its allegedly infringing marks. Such acquiescence operates to estop a senior user's trademark claim against a junior user's use of the mark unless there is inevitable confusion between the marks. *Coach House Restaurant v. Coach and Six Restaurants,* 934 F.2d 1551, 1564 (11th Cir.1991). Applying that standard to the facts, the district court found that inevitable confusion existed between the parties' names and that this inevitable confusion revived Sun Life of Canada's trademark rights. Accordingly, the district court permanently enjoined SunAmerica from any further use of the SUN LIFE mark.[1]

SunAmerica filed motions to alter or amend the judgment, to stay the judgment pending appeal, and for a new trial. The district court denied these motions, and SunAmerica filed with this Court an Emergency Motion to Stay Injunction Pending Appeal and to Expedite Appeal. We denied the motion to stay, but granted the motion to expedite the appeal. While the appeal was pending, SunAmerica complied with the injunction by changing the name of Sun Life of America to "SunAmerica Life Insurance Company."

## II. WHETHER THIS APPEAL SHOULD BE DISMISSED AS MOOT

A. THE ESTOPPEL ISSUE

In support of its motion to stay the injunction pending appeal, SunAmerica repeatedly represented to the district court that if it complied with the district court's injunction by changing its name from Sun Life Insurance Company of America, it would be impossible, from both a commercial and regulatory

---

[1]The district court also enjoined SunAmerica from further use of SUN FINANCIAL SERVICES, but SunAmerica does not appeal that aspect of the injunction.

standpoint, to later revert back to that name if SunAmerica prevailed on appeal. For example, SunAmerica's senior vice-president and general counsel stated in an affidavit that once a name change had been implemented, the change would be "essentially irreversible" and that reverting back to the prior name would be "commercially impossible." SunAmerica's counsel made numerous representations to the district court to the effect that "[e]ven if Sun Life of America were to prevail on appeal, it could not revert, either as a legal or practical matter, to its Sun Life of America name," and that "to deny a stay is to effectively deny any appellate relief." The district court rejected this argument and denied SunAmerica's motion for a stay, finding that a name change could be reversed if SunAmerica prevailed on appeal.

Echoing its refrain from the district court, SunAmerica made repeated representations to this Court, in connection with its emergency motion to stay, that compliance with the district court's injunction would "effectively moot and deny appellate rights and relief." SunAmerica made no fewer than eight such representations in its Emergency Motion to Stay Injunction Pending Appeal and to Expedite Appeal, including, for example, the following statements:

(1) [I]mplementing a name change is irreversible and would effectively moot Appellants' right of appeal.

(2) [O]nce [SunAmerica] begins to implement a name change, as a matter of commercial practicality it cannot reverse it. It will have lost ... its right to an appeal.

(3) [U]nless its initiation of the [compliance] process is stayed pending appeal, ... Sun Life of America's right of appeal will be a nullity.

A panel of this Court nonetheless denied SunAmerica's motion for a stay pending appeal, and SunAmerica has complied with the

injunction by changing its name.

The vigor with which SunAmerica argued that the name change would moot this appeal is matched only by the vigor with which it now argues, having been forced to change its name, that the appeal is not moot after all. The same corporation and attorneys who unequivocally represented to the district court and this Court that a name change would be irreversible "as a matter of commercial practicality," now just as unequivocally represent to this Court that the practical effects of the name change are, in fact, reversible. Such a sea change in factual representations prompted us to ask SunAmerica's counsel at oral argument which of their statements were false: the ones they made while seeking a stay, or the ones they made after the stay was denied.

The essence of counsel's response was that the representations were not really inconsistent because, even if it were commercially impractical for SunAmerica to "officially" revert back to its former name, relief from the injunction would permit SunAmerica to make other beneficial use of the SUN LIFE mark, such as using the mark in connection with a subsidiary created to market insurance products that the marketplace already associated with the Sun Life of America name. Therefore, reasoned counsel, the name change did not moot this appeal. Of course, SunAmerica was careful to omit any mention of the possibility of subsidiary use of the mark when it was insisting that a name change would moot this appeal. SunAmerica's representations to the district court and this Court that the name change would be irreversible *and* as a result its appeal would be moot necessarily carried with them a representation

that, absent a stay, no relief would be available to SunAmerica if it prevailed on appeal.  Or, as SunAmerica put it, unless the name change was stayed its "right of appeal [would] be a nullity."

Either an appeal is mooted by a particular event or it is not.  Whether a particular event moots an appeal does not change depending upon whether a party wishes that event to occur.  Here, SunAmerica made a clear factual representation, backed up with affidavits, that a name change would moot this case, but now unabashedly makes the opposite factual representation.  Attorneys should not, in the guise of "effective advocacy," make, or participate in making, factual representations to courts that are not true.  If a party represents to the court that the opposite of what he previously has represented about a factual matter is true, he owes the court a satisfactory explanation for the contradictory representations.  This is especially the case where, as here, the factual matters being represented (or misrepresented) are particularly within the knowledge of the parties whose attorneys are making the representations.

The type of tactics SunAmerica's counsel have employed in this case invite us to fashion a doctrine that would estop SunAmerica from asserting at this stage of the appeal the opposite of what it had asserted earlier.  In other words, we could hold that because SunAmerica repeatedly represented to the district court and to this Court that a name change would be irreversible and would moot this appeal, it is now estopped from denying that fact.  We decline to dispose of this case on that ground for two reasons.  First, we have not previously put parties and their

counsel on notice of such a doctrine, at least not in the context of mootness questions.  We do so now.  All future parties and their counsel are on notice that if they make factual representations in the district court or in this Court that denial of a stay will moot the appeal, they may be estopped from arguing after the stay is denied that the appeal is not moot.[2]  The second reason that we will not hold that SunAmerica is equitably estopped from denying that the name change is irreversible and the case is moot is that the district court expressly found to the contrary.  In denying the motion for stay pending appeal, the district court rejected SunAmerica's representations and found as a fact that a name change would not be irreversible.  In other words, the district court was not fooled.  The outcome of the estoppel analysis could well be different in a future case where there is no express factfinding

---

[2]SunAmerica argued to this Court that if we were to hold that this case is moot, we would be under a duty to vacate the judgment and injunctive orders of the district court under the principles of *United States v. Munsingwear, Inc.,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950) (noting the "established practice" of vacating judgments in moot cases). Because we decline to dismiss SunAmerica's appeal as moot on equitable principles, it is unnecessary for us to resolve definitively this question.  We do note, however, that vacatur is an equitable remedy.  *E.g., U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* --- U.S. ----, ---- - ----, 115 S.Ct. 386, 390-92, 130 L.Ed.2d 233 (1994).  Were we to enforce an equitable doctrine of mootness by estoppel, we would apply equitable principles in determining whether to vacate the district court's judgment in order to "dispose[ ] of the moot case[ ] in the manner "most consonant to justice.' "  *Id.* at ----, 115 S.Ct. at 391 (quoting *United States v. Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft,* 239 U.S. 466, 477, 36 S.Ct. 212, 216, 60 L.Ed. 387 (1916) (quoting *South Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.,* 145 U.S. 300, 302, 12 S.Ct. 921, 921, 36 L.Ed. 712 (1892))).  We could hardly be expected to grant the equitable remedy of vacatur where doing so would have the inequitable effect of rewarding a party for making inconsistent representations to this Court.

contrary to the representation in question.

B. TRADITIONAL MOOTNESS ANALYSIS

Having decided not to bar SunAmerica's present position on the mootness issue, we must now decide, using traditional doctrine, whether the case became moot when SunAmerica complied with the district court's injunction by changing the name of Sun Life Insurance Company of America. We conclude that it did not, because this Court could grant meaningful relief to SunAmerica if it were to prevail on this appeal.

Regardless of whether it is, in fact, "commercially impossible" for SunAmerica formally to reverse the name change process, relief from the district court's injunction would permit other commercial utilization of the SUN LIFE mark, such as using the mark in connection with a subsidiary created to market insurance products that the marketplace already associates with the Sun Life of America name. In other words, we think that SunAmerica's latest factual representations are true; its earlier ones were not. A case does not become moot simply because an appellate court is unable completely to restore the parties to the *status quo ante. Church of Scientology v. United States,* 506 U.S. 9, 12-14, 113 S.Ct. 447, 450, 121 L.Ed.2d 313 (1992). The ability of the appellate court to "effectuate a partial remedy" is sufficient to prevent mootness. *Id.; see also, e.g., United States v. Florida Azalea Specialists,* 19 F.3d 620, 622 (11th Cir.1994) (holding that appeal was not moot because the appellate court "could effectuate a partial remedy"). Because potential relief remains available to SunAmerica, we hold that this case is

not moot and that we have jurisdiction to decide the merits of this appeal. *See, e.g., North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (holding that federal courts must resolve questions of mootness before assuming jurisdiction).

**III. WHETHER THE INJUNCTIVE RELIEF GRANTED BY THE DISTRICT COURT WAS APPROPRIATE**

A. STANDARD OF REVIEW

Determination of this appeal requires consideration of: (1) the factfindings of the district court; (2) the district court's application of the law; and (3) the injunctive relief granted. We review the factfindings of the district court, to the extent they are properly presented on appeal, under the clearly erroneous standard. *E.g., Newell v. Prudential Ins. Co.,* 904 F.2d 644, 649 (11th Cir.1990). The district court's application of the law is subject to *de novo* review. *E.g., Church v. City of Huntsville,* 30 F.3d 1332, 1342 (11th Cir.1994). We review the district court's grant of injunctive relief for abuse of discretion, *e.g., Panama City Medical Diagnostic v. Williams,* 13 F.3d 1541, 1545 (11th Cir.1994), meaning we must affirm unless we at least determine that the district court has made a "clear error of judgment," *United States v. Kelly,* 888 F.2d 732, 745 (11th Cir.1989), or has applied an incorrect legal standard, *Cheney v. Anchor Glass Container Corp.,* 71 F.3d 848, 849 n. 2 (11th Cir.1996).

B. FACTFINDINGS OF THE DISTRICT COURT

A review of the key factfindings of the district court provides the backdrop to the legal analysis governing this case. Among the key ones are findings that:

(1) Sun Life of Canada is the senior user of the SUN LIFE mark.

(2) The likelihood of confusion among the SUN LIFE marks used by Sun Life of Canada and SunAmerica is "powerful" and "substantial." In fact, the confusion among the marks is "inevitable."

(3) The present confusion is not the result of Sun Life of Canada's actions.

(4) Neither the use of geographic modifiers nor the subdivision of channels of distribution is sufficient to remedy the present confusion.

In its brief to this Court, SunAmerica states that the issues it raises on appeal are questions of law subject to *de novo* review. SunAmerica has not explicitly argued in the briefs or at oral argument that any of the district court's factfindings are clearly erroneous. With one possible exception, SunAmerica does not even implicitly challenge any of the district court's findings of fact. As this Court has held repeatedly, "[a]n argument not made is waived." *Continental Technical Servs. v. Rockwell Int'l Corp.,* 927 F.2d 1198, 1199 (11th Cir.1991); *see also, e.g., Stepak v. Addison,* 20 F.3d 398, 412 (11th Cir.1994) (holding that issue not addressed on appeal is waived); *Roach v. M/V Aqua Grace*, 857 F.2d 1575, 1578 n. 1 (11th Cir.1988) (stating that district court's factual determination "has not been contested on appeal, and appellant's argument to the contrary has thus been abandoned").

Although SunAmerica does not challenge directly any of the district court's findings of fact, it does argue that the district court erred in failing to consider "whether the actions of Sun Life of Canada after acquiescence served to create additional confusion." The premise of this argument is contradicted by the district court's express finding that the "[p]laintiffs have not shown that the present confusion is the result of Defendant's

actions." That finding is not clearly erroneous. Because all of SunAmerica's potential challenges to the district court's factfindings are waived, without merit, or both, we turn now to a discussion of the legal issues.

## C. THE LEGAL PRINCIPLES INVOLVING ACQUIESCENCE, INEVITABLE CONFUSION, AND THE REVIVAL OF CLAIMS

To establish a prima facie case in an ordinary trademark infringement suit, a claimant need only demonstrate that: (1) it enjoys enforceable rights in its mark, and (2) the alleged infringer adopted a mark that is the same or confusingly similar. *E.g., Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984). Sun Life of Canada demonstrated both of these elements to the district court, something that SunAmerica does not dispute. Because Sun Life of Canada established a prima facie case, the district court was required to analyze SunAmerica's affirmative defenses. *SunAmerica I,* 24 U.S.P.Q. at 1509, 974 F.2d 1348, *infra* pp. ---- - ---- (Birch, J., concurring).

SunAmerica raised the affirmative defense of acquiescence. Acquiescence is an equitable defense that denotes active consent by a senior user to another's use of the mark. *Coach House,* 934 F.2d at 1558. The defense requires proof of three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice. *Id.* The district court considered SunAmerica's proof on these points and concluded that "[i]n this case, the facts show that Sun Life of Canada acquiesced to [SunAmerica's] use of the allegedly infringing

marks."  Sun Life of Canada does not challenge that conclusion.

Ordinarily, an acquiescence defense estops a senior user from asserting rights against a party for the use of the mark to which the senior user consented.  *See SunAmerica I,* 24 U.S.P.Q. at 1511, 974 F.2d 1348, *infra* pp. ---- - ---- (Birch, J., concurring); *Coach House,* 934 F.2d at 1564.  Additionally, the existence of acquiescence creates a legal duty on the part of the senior user to respect the junior user's mark and to avoid creating confusion with it.  *SunAmerica I,* 24 U.S.P.Q. at 1511, 974 F.2d 1348, *infra* pp. ---- - ---- (Birch, J., concurring).  Insofar as the senior user's and junior user's rights and duties respecting one another are concerned, acquiescence causes both users' marks to "stand in parity."  *Id.* at 1512, 974 F.2d 1348, *infra* p. ----.  "After acquiescence, the senior user and junior user must treat one another's marks with equal dignity."  *Id.* at 1511, 974 F.2d 1348, *infra* p. ----.

However, the defense of acquiescence is not absolute.  Upon a showing that "inevitable confusion"[3] arises from the continued dual use of the marks, a senior user's claim may be revived from estoppel.  *Id.* at 1510, 974 F.2d 1348, *infra* p. ----;  *Coach House,* 934 F.2d at 1564;  *Iodent Chem. v. Dart Drug Corp.,* 207 U.S.P.Q. 602, 607 (T.T.A.B.1980).  As we explained in  *Coach House,* the

---

[3]Due to the fact-intensive nature of the inquiry, "inevitable confusion" does not lend itself to a formulaic, mechanical definition.  For present purposes, it is sufficient to note that "the standard of confusion required for a finding of inevitability of confusion is an increment higher than that required for a finding of a likelihood of confusion." *Coach House Restaurant v. Coach and Six Restaurants,* 934 F.2d 1551, 1564 (11th Cir.1991).

purpose of such a revival is to vindicate the public interest in avoiding inevitable confusion in the marketplace: "Although [the senior user] has acquiesced in use of their logo by the [junior user], the public interest in preventing confusion around the marketplace is paramount to any inequity caused the [junior user]. Consequently, if there is an inevitability of confusion, [the senior user's] law suit may be revived from estoppel." *Coach House,* 934 F.2d at 1564. Here, the district court found inevitable confusion and held that the public interest required revival of Sun Life of Canada's prior trademark rights.

As noted previously, SunAmerica does not dispute the district court's factual finding of inevitable confusion. Instead, it advances two alternative theories to challenge the district court's legal analysis about inevitable confusion. First, SunAmerica argues that the concept of inevitable confusion applies solely to trademark registration and has no application in the infringement suit context. This argument is squarely foreclosed by our contrary holding in *Coach House,* 934 F.2d at 1564. *See, e.g., Davis v. Estelle,* 529 F.2d 437, 441 (5th Cir.1976) (holding that "[o]ne panel of this Court cannot disregard the precedent set by a prior panel").

Second, SunAmerica argues that the district court erred by "automatically" reviving Sun Life of Canada's claim from estoppel. As SunAmerica correctly notes, we said in *Coach House* that "if there is an inevitability of confusion, petitioner's law suit may be revived from estoppel." *Coach House,* 934 F.2d at 1564. SunAmerica seizes on the single word "may" to urge that a district

court has considerable discretion in determining whether a senior user's claim should be revived from estoppel after a finding of inevitable confusion, and argues that a court should engage in an intricate balancing test before deciding how to exercise that discretion. This argument illustrates the misunderstandings that can arise from a myopic focus on a single word.

We do not read *Coach House* to require district judges to engage in a complex balancing test to determine whether, after a showing of inevitable confusion, a senior user's claim is revived from estoppel. As we explained elsewhere in the *Coach House* opinion, "In the event that petitioner ... proves the inevitability of confusion required to survive the estoppel by acquiescence in use at trial, the district court *will have to address* petitioner's newest claims of servicemark infringement and unfair competition." *Id.* at 1565 (emphasis added). In other words, unless an acquiescent senior user shows inevitable confusion, estoppel bars the senior user's claims; those claims may not (meaning "cannot") be revived. When inevitable confusion is shown, however, the senior user is no longer estopped; thus we say that the previously-estopped claims "may" now be heard, not because a discretionary test has entered the analysis, but because that which was previously disallowed is now allowed. When that happens, the district court, as we said, "will have to address" the senior user's claims.

Moreover, SunAmerica's proposed balancing test would add an additional layer of complexity to an analysis that is already, of necessity, complex. Accordingly, the district court did not err by

reviving, upon a showing of inevitable confusion, Sun Life of Canada's claims that were otherwise estopped by acquiescence. The kind of balancing and exercise of discretion for which SunAmerica calls is appropriate when the district court must decide what relief to fashion after a senior user prevails on a revived claim, but not earlier in the process when the district court is deciding whether the senior user has "prove[n] the inevitability of confusion required to survive the estoppel by acquiescence." *Coach House,* 934 F.2d at 1565.

D. FASHIONING EQUITABLE RELIEF FOR REVIVED CLAIMS

Once a senior user demonstrates the inevitable confusion required to revive a claim otherwise estopped by acquiescence, the district court must determine the scope and nature of relief to be granted. The senior user's ability to make out a prima facie case will already have been established before consideration of affirmative defenses, such as acquiescence. *See SunAmerica I,* 24 U.S.P.Q. at 1509, 974 F.2d 1348, *infra* pp. ---- - ---- (Birch, J., concurring). Therefore, the only task remaining before the district court will be to determine the remedy best suited to meet the goals of eliminating the inevitable confusion and protecting the public interest.

Section 34(a) of the Lanham Act directs district courts to apply traditional equitable principles when fashioning injunctive relief in trademark cases: "The several courts vested with jurisdiction of civil actions arising under this Act shall have power to grant injunctions, *according to the principles of equity and upon such terms as the court may deem reasonable ....*"  15

U.S.C.A. § 1116(a) (West Supp.1995) (emphasis added). Equitable principles require consideration of the unique circumstances of each case, with due regard for flexibility, practicality, and the public interest:

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Hecht Co. v. Bowles,* 321 U.S. 321, 329-30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

> In trademark cases, the scope of the injunction to be entered depends upon the manner in which plaintiff is harmed, the possible means by which that harm can be avoided, the viability of the defenses raised, and the burden that would be imposed on defendant and the potential effect on competition between the parties.... "The law requires that courts closely tailor injunctions to the harm that they address."

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 30.03[1] (4th ed. 1995) (quoting *ALPO Petfoods v. Ralston Purina Co.,* 913 F.2d 958, 972 (D.C.Cir.1990)). Therefore, we have stated that "[t]he equitable relief that is granted should be only that which is required to distinguish the two products, and no more." *B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1270 (5th Cir.1971).

Although the equitable principles reviewed above are relevant to the relief stage of any trademark case, they apply with unique force in cases involving acquiescence. In such cases, but for the presence of inevitable confusion, the competing marks would "stand in parity" and be of "equal dignity." *See SunAmerica I,* 24 U.S.P.Q. at 1511-12, 974 F.2d 1348, *infra* pp. ---- - ---- (Birch,

J., concurring). For this reason, acquiescence cases are distinguishable from ordinary trademark infringement actions, in which complete injunctions against the infringing party are the order of the day. *See, e.g., First Fed. Sav. & Loan Ass'n v. First Fed. Sav. & Loan Ass'n,* 929 F.2d 382, 384-85 (8th Cir.1991) (upholding complete injunction where substantial evidence of actual confusion was shown). In contrast, where competing marks are of equal dignity due to acquiescence, *any* restriction of the junior user's previously unrestricted freedom to use its mark results in a certain degree of undeserved, albeit necessary, hardship. The law requires this hardship because "the public interest in preventing confusion around the marketplace is paramount," *Coach House,* 934 F.2d at 1564, but the legitimate coexisting interests of the parties in an acquiescence case counsels for minimizing the hardship on either party to the extent possible consistent with the public interest. Therefore, the hardship of a total injunction against a junior user in an acquiescence case is permissible only if the junior user fails to demonstrate the availability of a feasible and effective alternative means of redressing the senior user's revived claim and vindicating the public interest in eliminating marketplace confusion, without causing undue hardship to the senior user.[4]

---

[4]As an additional factor in fashioning equitable relief while avoiding unnecessary hardship to the junior user, the district court should consider the history leading to the inevitable confusion that revives the senior user's claims. Specifically, it should consider whether the senior user comes to the court with "unclean hands" wrongfully seeking to appropriate the goodwill of the junior user's mark. The district court should not enter injunctive relief that rewards a senior user that has intentionally created inevitable confusion in order to

The underpinnings of the foregoing rule of law are illuminated by a brief consideration of the basic values at stake in such a case. When inevitable confusion occurs in the marketplace due to unrestricted dual use of a trademark, the "paramount" value of the public interest demands some adjustment to the status quo; some remedy must be fashioned. The confusion must be remedies even where, as here, dual use after acquiescence causes the competing marks otherwise to stand in parity. Any adjustment to the status quo, however, will work some hardship on one or both of the parties, because the court's imposition of a remedy will end the previously unrestricted use of the mark by both parties. Someone must suffer the remedy, and the law demands it not be the public. That leaves only the parties to shoulder the hardship necessary to end the confusion. Accordingly, the question becomes how the requisite hardship will be allocated between the parties while giving due consideration to their legitimate interests in the mark.

The court should give due consideration to the parties' legitimate interests by considering the full range of remedial alternatives available to cure marketplace confusion and to redress the senior user's revived claim. When feasible and effective, the court should fashion a remedy less harsh than the strong medicine of a total injunction. On occasion, however, only that strong

revive its claim from estoppel, after acquiescing in a competitor's use of a mark while that competitor establishes goodwill in the mark. SunAmerica argues that this case presents us with just such a scenario, but the district court found as a fact that Sun Life of Canada did not cause the present confusion. Should this hypothetical materialize in a future case, we are confident that district courts will be able to fashion injunctive relief that avoids the unjust enrichment of a predatory senior user.

medicine will do and a total injunction must issue against one party or the other. In that circumstance, it is to be expected that usually the injunction will issue against the junior user. That presumption is justified, if for no other reason, because the senior user had the mark first, and it was the junior user who began the mutual use that led eventually to inevitable confusion. Stated differently, a junior user assumes the risk that, even if the senior user acquiesces to the junior's use, inevitable confusion may someday arise in the marketplace and that the only feasible and effective way to eliminate this confusion will be a complete injunction following revival of the senior user's claim.

In determining whether a remedy less than a total injunction against the junior's use is feasible and effective, a court should bear in mind that absent some overriding consideration, the senior user ordinarily should not be required to stomach more of the remedial medicine than the junior user. The same considerations we have discussed that support the presumption that a total injunction, where necessary, should ordinarily fall on the junior user also support a presumption that in most cases the senior user should not have to shoulder more of the remedial burden than the junior user. Neither of these presumptions are insurmountable, and we hedge by saying "ordinarily" and "in most cases," because we cannot predict all the variables that will arise and, after all, we are in the domain of equity, which is not easily fenced.

That point leads us to a discussion of our scope of review of a district court's decision about how to remedy inevitable confusion following from acquiescent use. As in virtually every

other area of the law, we will review factfindings only for clear error. We will also review, essentially de novo, to ensure that the district court applied the correct legal principles, which we have previously discussed, to the facts. The applicable law does not, however, function like a mathematical formula. The same facts plugged into the same analytical framework will not necessarily yield the same decision. The legal principles are not that precise; there is room for judgment and for the exercise of equitable discretion.

Accordingly, where the district court has not clearly erred in finding the facts and has applied the correct legal principles, we will review its ultimate remedial decision only for abuse of discretion. The abuse of discretion standard of review is not uniform across the law. It is applied more narrowly in some areas than in others. *See United States v. Cox,* 995 F.2d 1041, 1043-44 (11th Cir.1993) (explaining that, although both grants and denials of new trial motions are reviewed under the abuse of discretion standard, "we have ... accorded grants of such motions less deference than denials"). What we mean here when we say that we will review the district court's ultimate decision about how to remedy post-acquiescence inevitable confusion is that the district court will be given considerable leeway, that there will be a wide decisional range within which we will not reverse the court even if we would have reached a different decision. *See Macklin v. Singletary,* 24 F.3d 1307, 1311-12 (11th Cir.1994) (discussing abuse of discretion review in terms of the district court's range of permissible decisional choices).

E. THE REMEDY DECISION IN THIS CASE

We turn now to a review of the district court's remedy decision in this case. After finding that Sun Life of Canada had demonstrated the inevitable confusion required to revive its claim from estoppel by acquiescence, the district court entered an order enjoining SunAmerica from any further use of any SUN LIFE mark. The district court completely enjoined SunAmerica's use of the mark, even though SunAmerica proposed to the district court five alternatives to a complete injunction: (1) requiring both parties to use geographic modifiers in connection with their SUN LIFE marks; (2) subdividing the distribution market such that SunAmerica could use the SUN LIFE mark in the independent broker-dealer market while Sun Life of Canada could use the mark only through its career agent sales force; (3) prohibiting the use of the SUN LIFE (U.S.) mark by Sun Life of Canada; (4) requiring the parties to conduct mutual educational campaigns to differentiate the parties and their marks; and (5) imposing guidelines regarding the use and prominence of geographic modifiers and/or corporate logos in connection with the SUN LIFE marks. SunAmerica suggested that combinations of these alternatives should be considered.

The district court considered and rejected the first three alternatives. As to the first, the district court found that geographic modifiers would be insufficient to alleviate the high levels of confusion in the marketplace. As to the second, the court found that the distribution market could not be meaningfully subdivided. As to the third, the court found that Sun Life of

Canada had not used the SUN LIFE (U.S.) mark since May 1992, indicating that an injunction barring use of that mark by Sun Life of Canada would not effectively eliminate marketplace confusion. None of these factfindings—and they are factfindings—is clearly erroneous.

We are unable to determine, however, whether the district court considered SunAmerica's other two proposed remedies before enjoining SunAmerica from all further use of the SUN LIFE mark. We are also unable to determine if the district court considered whether the use of geographic modifiers in *combination* with educational efforts and guidelines regarding the use and prominence of those modifiers and/or corporate logos would have been feasible and effective. The district court may have considered and rejected all of these alternatives, but we cannot tell for sure. If the court did consider and reject them—if it found as a fact that they would not end inevitable public confusion over the marks—our review of the record indicates that such a finding would not have been clearly erroneous. However, we are not prepared to say at this time that a contrary finding—such as that some combination of the alternatives would have sufficed to protect the public interest against marketplace confusion—would be clearly erroneous.

Therefore, we remand this case for the limited purpose of providing the district court an opportunity to consider whether any of SunAmerica's proposed alternatives to a complete injunction would have sufficiently vindicated the public interest in eliminating marketplace confusion. We leave to the sound discretion of the district court the determination of whether

further hearings are needed for this purpose.  If the district court finds that none of the other alternatives, by themselves or in combination, would end inevitable confusion, then the district court's complete injunction against SunAmerica's use of the marks is the only feasible and effective remedy.  If, on the other hand, the district court finds as a fact that some remedy or remedies other than a complete injunction would be feasible and effective, then the court should exercise its discretion, guided by the general principles we have discussed previously, to choose among all of the available remedies.

We REMAND this case to the district court for proceedings consistent with this opinion.  We leave the permanent injunction in place for the district court to revisit if the results of the proceedings it conducts consistent with this opinion indicate that it should.

Because of the nature and complexity of the issues in this case, our familiarity with them, and the nature of the remand, this panel will exercise jurisdiction over a future appeal, should there be one.

APPENDIX

DO NOT PUBLISH

IN THE UNITED STATES
COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT


No. 91-8860

D.C. Docket No. 1:89-cv-1315-JTC

 SunAmerica Corporation, a Delaware Corporation, f/n/a Sun Life Group of America;  Sun Life Insurance Company of America, a Maryland corporation, Plaintiffs, Counterclaim-Defendants,

Appellees,

versus

Sun Life Assurance Company of Canada, a Canadian corporation; Sun Life Assurance Company of Canada (U.S.), a Delaware corporation, Defendants, Counterclaim-Plaintiffs, Appellants.

Appeal from the United States District Court
for the Northern District of Georgia

(September 9, 1992)

Before BIRCH, Circuit Judge, HILL and ESCHBACH[*****], Senior Circuit Judges.

PER CURIAM:

This case involves important trademark issues that are factually and legally complex. Plaintiffs SunAmerica Corporation and its wholly-owned subsidiary, Sun Life Insurance Company of America ("Sun Life of America") (collectively, "SunAmerica"), brought suit against defendants Sun Life Assurance Company of Canada and its subsidiary, Sun Life Assurance Company of Canada (U.S.) ("Sun Life of Canada (U.S.)") (collectively, "Sun Life of Canada"). SunAmerica uses the mark SUN LIFE OF AMERICA; Sun Life of Canada uses the mark SUN LIFE OF CANADA. In essence, each party has now charged the other with employing confusingly similar marks to designate its insurance products, in violation of the trademark laws.

In the district court, both sides moved for summary judgment on various claims and legal theories. The district court correctly discerned that disputed issues of material fact precluded summary judgment on the vast majority of these claims. However, the court

_____

[*****]Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

concluded that one claim could be resolved on summary judgment—Sun Life of Canada's use of the abbreviated mark SUN LIFE (U.S.) to designate products affiliated with its American subsidiary. The district court found the SUN LIFE (U.S.) mark to be confusingly similar to SunAmerica's use of SUN LIFE OF AMERICA. Accordingly, the court permanently enjoined Sun Life of Canada from using SUN LIFE (U.S.) without some form of the geographical modifier "of Canada." The propriety of this injunctive relief is all that is before us on this appeal.

We hold that the issuance of the permanent injunction at this stage of this case was improper. This is a complicated trademark dispute, rife with subtle and pivotal interrelationships. The district court's resolution of one trademark claim in this unique case, without careful and proper regard for these interrelationships, was error. In particular, the trial court failed to explicitly delineate and resolve the issues raised by Sun Life of Canada's counterclaim. In that counterclaim, Sun Life of Canada alleges that SunAmerica is not entitled to receive protection for *any* "Sun Life" mark because SunAmerica is the junior user of a "Sun Life" mark. In other words, Sun Life of Canada claims that its use of SUN LIFE (U.S.) cannot be enjoined in order to avoid confusion with SUN LIFE OF AMERICA because SunAmerica has no enforceable rights in the mark SUN LIFE OF AMERICA. We agree with Sun Life of Canada that the resolution of this issue was a prerequisite to determining SunAmerica's entitlement to a permanent injunction. In failing to rule explicitly on all aspects of this subject, the trial court's summary judgment injunction was

premature.

Therefore, we VACATE the permanent injunction entered by the district court and REMAND the case to the district court for further proceedings.

BIRCH, Circuit Judge, specially concurring:

The majority has found the district court's analysis and development wanting. Since I am convinced that simply remanding the case to the district judge without any comment may result in future problems, I have succumbed to temptation and will endeavor to provide some observations relative to the issues presented in this complex case. The parties and the district court may well choose to ignore these offerings, but hopefully, all concerned may find them to be of some benefit in reaching a resolution of this conflict.

I.

A.

The district court found that over the past few years, Sun Life of Canada and SunAmerica have been "engaged in providing similar [insurance] products and services, through similar trade channels to similar customers, often through similar advertising media." R15-137-13. This was not always the case. Sun Life of Canada is the older and larger of the companies. Founded in Canada in 1865, Sun Life of Canada began operations in the United States in 1895, and it is not disputed that it was the first user of a "Sun Life" mark for insurance products in this country. From its inception, Sun Life of Canada has promoted and sold a variety of insurance products to investment-oriented clients, including

traditional life insurance, immediate annuities, and deferred annuities.

Although the current subsidiary of SunAmerica was founded in Maryland in 1890, the company did not operate under the name Sun Life Insurance Company of America until 1916.  Sun Life of America was always smaller and more specialized.  Throughout most of its history, Sun Life of America's business was primarily constituted by the sale of basic mortality-based life insurance to industrial workers in the Middle-Atlantic states.  Despite the similarity of names, then, Sun Life of Canada and Sun Life of America coexisted peacefully for much of their history, apparently because they sold different products in different markets to different clients.  Both parties admit to this harmonious coexistence.  In fact, relations were so cordial that "[i]n every circumstance in which the two companies sought to expand into the same states, the first registered company, typically Sun Life of Canada, gave its consent to the newly-entering company seeking registration."  R15-137-3.

Beginning in the early 1970s, seeds of tension were planted. Sun Life of Canada created its American subsidiary, Sun Life of Canada (U.S.), and began occasional abbreviation of that name to "Sun Life (U.S.)" in 1973.  Sun Life of Canada also began exploring new means of distribution for its products;  in particular, the lucrative channels of national and regional stock brokerage firms and broker-dealers.  In 1978, Sun Life of Canada contracted with Merrill Lynch for the distribution of annuities.  In 1982, Sun Life of Canada acquired Massachusetts Financial Services Company ("MFS"), one of the largest investment advisors in the United

States.  By 1983, then, Sun Life of Canada and Sun Life of Canada (U.S.) were marketing insurance products via brokerage houses and broker-dealers utilizing the name, at least to some extent, "Sun Life (U.S.)."

The early 1970s were also the origins of change for Sun Life of America.  The conglomerate Kaufman & Broad, Inc. ("Broad Inc.") acquired Sun Life of America in 1973.  Under the direction of Broad Inc., Sun Life of America began to modernize and expand.  By the end of the 1970s, Sun Life of America had experimented with different products, different distribution channels, and different clients.  In particular, Sun Life of America began experimenting with the sale of annuities, through broker-dealers, to investment-oriented clients.  By the early 1980s, the seeds of tension were beginning to take root.  Sun Life of Canada (U.S.) was sprouting with a shortened name;  Sun Life of America was sprouting with a different business.  The clash was almost inevitable.[1]

Sun Life of America first protested Sun Life of Canada's use of the mark SUN LIFE (U.S.) in June 1983.  Sun Life of Canada declined to stop its use of the shortened name of its American subsidiary.  Before Sun Life of America objected again in 1988, Sun Life of Canada had sold some 4 billion dollars worth of innovative annuity products, designated (at least in part) by the mark SUN LIFE (U.S.), through MFS and other brokerage houses and

---

[1]Two attempts to pretermit the clash failed.  An agreement reached in 1980—providing for the inclusion of the geographic modifiers "of Canada" and "of America"—was limited to specified names and marks.  A broader "understanding" about the inclusion of geographic modifiers was reached in 1982, but this understanding was never formalized.

broker-dealers.  On the other side of this developing conflict, Sun Life of America continued its transformation into a company that would also sell annuities to investment-oriented clients through broker-dealer channels of distribution.  In 1984, Sun Life of American began its first significant development and marketing of annuity products.  Sun Life of America would shortly acquire several brokerage firms.  Sun Life of Canada claims that by the end of 1989, Sun Life of America had completely abandoned its origins—selling mortality-based life insurance to industrial workers in the Middle-Atlantic states—in favor of a sophisticated and revamped insurance business that competed directly with Sun Life of Canada.

Shortly after Sun Life of America adopted its new name in 1916, Sun Life of Canada wrote the following in a letter to Sun Life of America:  "Under the circumstances, there is nothing to be done in the matter, but to endeavor as far as possible, to avoid any confusion through this similarity of names."  R15-137-3.  In June 1989, the endeavoring ended and the litigation began.

## B.

SunAmerica's lawsuit asserted various state and federal claims against Sun Life of Canada.  However, only SunAmerica's trademark claim concerning Sun Life of Canada's use of SUN LIFE (U.S.) is at issue in this appeal.[2]  SunAmerica's principal allegation with

---

[2]SunAmerica also challenged (1) Sun Life of Canada's adoption of a new "S" logo that allegedly infringes SunAmerica's "S" logo, (2) Sun Life of Canada's use of the name "Sun Financial Group" that allegedly infringes SunAmerica's use of "Sun Financial Services," and (3) the continuing vitality of various other Sun Life of Canada marks.

respect to this claim is that the use of SUN LIFE (U.S.) falsely suggests to the public that Sun Life of Canada's insurance products originate with SunAmerica, in violation of SunAmerica's trademark rights under section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a) (1988).

In addition to responding to SunAmerica's allegations, Sun Life of Canada counterclaimed. The counterclaim relevant to this appeal[3] contended that

> Sun Life of Canada began using its name SUN LIFE OF CANADA in the United States many years before plaintiffs began using SUN LIFE OF AMERICA, that plaintiffs' usage of SUN LIFE OF AMERICA has caused, and is likely to cause, confusion with defendants' SUN LIFE OF CANADA name, and that plaintiffs should therefore be enjoined from all further use of the SUN LIFE OF AMERICA name and any other name or mark containing the salient words SUN LIFE.

Appellants' Br. at 3. Although no party moved for summary judgment with respect to Sun Life of Canada's counterclaim, both parties submitted cross motions for summary judgment with respect to SunAmerica's challenge to the use of SUN LIFE (U.S.).

The district court granted summary judgment to SunAmerica. The trial court quickly found a likelihood of confusion based upon an analysis of the marks at issue. Echoing this circuit's seven-factor test for likelihood of confusion, *see Dieter v. B & H Indus.,* 880 F.2d 322, 326 (11th Cir.1989), *cert. denied,* [498] U.S. [950], 111 S.Ct. 369, 112 L.Ed.2d 332 (1990); *Jellibeans, Inc. v. Skating Clubs,* 716 F.2d 833, 840 (11th Cir.1983), the district court ruled that there was a risk of confusion because SUN LIFE (U.S.) could be considered "synonymous" with SUN LIFE OF AMERICA.

---

[3]Sun Life of Canada also challenged (1) SunAmerica's "S" logo, and (2) SunAmerica's right to use the name "SunAmerica."

In support of its finding, the court cited the companies' now similar products, distribution channels, clients, and advertising, as well as evidence of actual confusion. *See* R15-137-13-14. Accordingly, the court permanently enjoined Sun Life of Canada from using SUN LIFE (U.S.) standing alone in any advertisements, promotional materials, press releases or other materials. Sun Life of Canada's counterclaim—asserting that SunAmerica had no enforceable rights in any "Sun Life" mark whatsoever—remained pending.

## II.

### A.

Sun Life of Canada contends that the district court improperly granted a permanent injunction without first completely resolving the issues raised by the counterclaim:

> [T]he District Court's summary judgment injunction should be reversed because it is based on the invalid assumption that plaintiffs have a continuing right to use the name SUN LIFE OF AMERICA. Defendants' counterclaim ... asserts that the confusion between the parties is caused by the fact that their full names both begin with SUN LIFE, that defendants admittedly used SUN LIFE OF CANADA long prior to plaintiffs' first use of SUN LIFE OF AMERICA, and that the only effective way to prevent confusion is to enjoin plaintiffs, the junior users of a SUN LIFE name, from all further use of SUN LIFE OF AMERICA. If defendants prevail on this claim at trial, the sole basis for the summary judgment injunction—the finding that defendants' use of SUN LIFE (U.S.) is likely to be confused with plaintiffs' use of SUN LIFE OF AMERICA—will be eliminated.

Appellants' Br. at 23. I agree with Sun Life of Canada.

An explicit determination of the issues raised by Sun Life of Canada's counterclaim was required before the district court could properly enter a permanent injunction in favor of SunAmerica. SunAmerica's claim was based upon section 43(a) of the Lanham Act,

which provides in relevant part:

> Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, ... which
>
> (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1988). This court has repeatedly held that in order to be entitled to injunctive relief under section 43(a) of the APPENDIX—Continued

Lanham Act, a plaintiff must establish *both* "(1) that it has trademark rights in the mark or name at issue ... and (2) that the defendant adopted a mark or name that was the same, or confusingly similar to the plaintiff's mark, such that there was a likelihood of confusion...." *ConAgra, [Conagra] Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984) (citation omitted); *see Investacorp, Inc. v. Arabian Inv. Banking Corp.,* 931 F.2d 1519, 1521-22 (11th Cir.), *cert. denied,* [502] U.S. [1005], 112 S.Ct. 639, 116 L.Ed.2d 657 (1991); *American Television and Communications Corp. v. American Communications and Television, Inc.,* 810 F.2d 1546, 1548 (11th Cir.1987). Sun Life of Canada's counterclaim undertakes directly to refute the existence of the first element that SunAmerica must establish under section 43(a)—that SunAmerica has enforceable trademark rights in the mark or name SUN LIFE OF

AMERICA. By skipping to the confusion issues and failing to rule explicitly on SunAmerica's right to use any "Sun Life" mark, the district court issued a permanent injunction that was premature.

As the moving party, Sun Life of America was required to establish that there was no genuine issue of material fact about its right to use SUN LIFE OF AMERICA and that it was entitled to judgment as a matter of law on that issue. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The district court did not make a specific ruling on the precise issue of Sun Life of America's right to use "Sun Life" in light of Sun Life of Canada's counterclaim. Indeed, the court did not make any specific findings of fact or conclusions of law with respect to this matter. Although, generally, a district court may not be required to make such findings and conclusions in support of summary judgment rulings, *see* Fed.R.Civ.P. 52(a), the cases have stressed the importance of such findings to facilitate meaningful appellate review. *See, e.g., Clay v. Equifax, Inc.,* 762 F.2d 952, 956-58 (11th Cir.1985); *Hanson v. Aetna Life & Casualty,* 625 F.2d 573, 575-76 (5th Cir.1980).

SunAmerica claims that the district court did reach a decision on the issues raised by Sun Life of Canada's counterclaim. I do not agree. The district court did give isolated commentary about SunAmerica's right to use "Sun Life," but I do not consider this commentary to be an adequate disposition of these issues. Sun Life of Canada's counterclaim and its impact upon SunAmerica's entitlement to a permanent injunction was not specifically

addressed by the district court. On this particular record, then, one cannot discern whether the district court ruled, after a full and fair consideration of the issue, that Sun Life of America has a protectible trademark interest in the use of "Sun Life." Perhaps just as important, even assuming the district court did rule on the issue, the court's factual and legal bases for doing so are unclear, making appellate review of the purported decision difficult if not impossible.

B.

I am not convinced that the district court's isolated commentary on the issues raised by Sun Life of Canada's counterclaim constituted a ruling on the subject, that commentary persuades me to further delineate and describe the precise issues that will likely confront the district court on remand. The district court's discussion evinces the need for doctrinal moorings. In suggesting that SunAmerica has enforceable rights in SUN LIFE OF AMERICA, the district court stated that Sun Life of Canada was precluded from challenging the use of SUN LIFE OF AMERICA because it had permitted another party to use that mark for such a long period of time. The district court sporadically invoked various legal doctrines in support of its suggestion, but did not expand upon the elements of any one. *See* R15-137-14 (acquiescence); *id.* (equitable estoppel); *id.* at 15 (laches); *id.* at 26 (waiver). Moreover, the district court did not rely upon any trademark case law in touching upon the issues raised by Sun Life of Canada's counterclaim. I believe that a more methodical approach, complete with an analysis of the issues as clarified by

this circuit's trademark jurisprudence, is essential in this case. Resolution of complex intellectual property issues is seldom properly accomplished in a broad and conclusory opinion format.

With respect to the issues raised by Sun Life of Canada's counterclaim, the starting point must be Sun Life of Canada's ability to establish a prima facie case under section 43(a) of the Lanham Act.[4]  Once again, pursuant to the case law established in this circuit, Sun Life of Canada is required to demonstrate both

---

[4]Sun Life of Canada registered SUN LIFE OF CANADA in 1967. However, such a registration would not defeat Sun Life of America's prior rights (if any) created by its long prior use of SUN LIFE OF AMERICA.  *See* 15 U.S.C. §§ 1065, 1051 (1988).

Sun Life of Canada has also registered the following "Sun" marks:

| | |
|---|---|
| SUN LIFE OF CANADA | 1967 |
| FOLLOW THE SUN FOR LIFE | 1967 |
| SUN FUND | 1971 |
| SUN FUND (plus design) | 1971 |
| SUN PLAN | 1981 |
| SUN LIFE OF CANADA (stylized) | 1981 |
| SUN LIFEMASTER | 1984 |
| SUNPLAN 2 | 1984 |
| SUN INTERESTMASTER | 1985 |
| SUN PENSIONMASTER | 1985 |
| SUN INTERESTMASTER-Q | 1985 |
| SUN EXECUMASTER | 1986 |
| SUN ULTRATERM | 1987 |
| SUN FINANCIAL GROUP | 1987 |

SunAmerica has only registered its name "SunAmerica."

that it enjoys enforceable rights in its SUN LIFE OF CANADA mark and that Sun Life of America's use of SUN LIFE OF AMERICA generated a likelihood of confusion. *E.g., ConAgra* [*Conagra* ], 743 F.2d at 1512. With respect to the first factor, Sun Life of Canada would need to demonstrate not only its first use of the unregistered mark,[5] but also that it acquired a protectible interest in SUN LIFE OF CANADA (or the shortened form SUN LIFE[6]), either because the mark is inherently distinctive or because the mark has acquired secondary meaning. *E.g., Investacorp,* 931 F.2d at 1522. With respect to the confusion issue, the district court's analysis should once again be guided by the seven-factor test utilized in cases like *Dieter* and *Jellibeans.*

Only after first discerning the extent of Sun Life of Canada's protectible interest and any likelihood of confusion should the district court proceed to an analysis of SunAmerica's potential affirmative defenses. Although the district court loosely characterized SunAmerica's putative defense, it appears from the record that in all probability SunAmerica's defense sounds in acquiescence. The distinguishing feature of the acquiescence defense is the element of *active* or *explicit* consent to the use of an allegedly infringing mark. *Coach House Restaurant v. Coach and Six Restaurants,* 934 F.2d 1551, 1558 (11th Cir.1991). SunAmerica has clearly claimed that Sun Life of Canada granted SunAmerica express permission to use the SUN LIFE OF AMERICA mark;

---

[5]Apparently, Sun Life of Canada was the first user of a "Sun Life" mark in 45 of the 50 states.

[6]Sun Life of Canada's mark may have been occasionally abbreviated to just SUN LIFE as early as 1914.

demonstrated, for example, by Sun Life of Canada's aid in helping Sun Life of America clear the hurdles imposed by the insurance regulators of various states.[7]

SunAmerica can establish an acquiescence defense only if it shows:

(1) That [Sun Life of Canada] actively represented that it would not assert a right or a claim;

(2) that the delay between the active representation and assertion of the right or claim was not excusable;  and

(3) that the delay caused [Sun Life of America] undue prejudice.

*Coach House,* 934 F.2d at 1558.[8]  Acquiescence would estop Sun Life of Canada from APPENDIX—Continued extinguishing SunAmerica's use of SUN LIFE OF AMERICA, unless there is an inevitability of confusion between the two marks.    *Id.* at 1564.   I express no opinion on SunAmerica's ability to establish

---

[7]The laches defense is associated with more passive consent, usually demonstrated by a long period of silence. *Coach House,* 934 F.2d at 1558.  Although "estoppel" or "estoppel by laches" is sometimes used in the trademark area, the district court appears to have borrowed its "equitable estoppel" language from the workers' compensation context, as evidenced by the court's citation to *DeShong v. Seaboard Coast Line R.R.,* 737 F.2d 1520 (11th Cir.1984).  The district court's invocation of "waiver" has no trademark roots.

[8]Sun Life of Canada's arguments on appeal imply that even if SunAmerica could establish these three elements of an acquiescence defense, Sun Life of Canada could still "revoke" its acquiescence because acquiescence is merely an "implied license" to use a mark.  *See ConAgra* [*Conagra* ], 743 F.2d at 1516.  I disagree.  *ConAgra* [*Conagra* ] stated that "[a]cquiescence *alone* is analogous to an implied license to use the name." *Id.* (emphasis added).  By this, the court meant that if *only the first element is established*—active consent—then the permission is revocable.  Once the remaining elements of acquiescence are established, however, the permission is not revocable. *Id.* at 1516-18;  *see also Coach House,* 934 F.2d at 1558 & n. 18, 1563-64.

this defense to Sun Life of Canada's counterclaim. I note only that the court's analysis of the first and third elements should be straightforward based upon the evidence in the record; accordingly, I will not comment further on those elements. However, I believe that the second element requires additional guidance.

In determining whether or not a prior user's delay is "excusable," the district court must not limit itself solely to a raw calculation of the time period involved. Rather, the court should also examine the *reasons* for any delay. In the context of this case, Sun Life of Canada has at least advanced a colorable excuse: Sun Life of Canada contends that it had no reason to assert an early challenge to Sun Life of America's use of a "Sun Life" mark because until 1989, Sun Life of America sold different products in a different market through different distribution channels. Moreover, it may be that Sun Life of Canada could not have *successfully* prosecuted an earlier infringement challenge because until Sun Life of America changed its business, there was negligible likelihood of confusion. Pursuit of an infringement action may have been futile. Once again, I express no opinion on whether or not any delay on the part of Sun Life of Canada was "excusable." "Careful consideration of these factors, the possible need for additional evidence, the finding of facts on the elements of the ... defense, and the sound exercise of discretion based on the facts are matters best left to the district court on remand." *ConAgra* [*Conagra* ], 743 F.2d at 1518.

C.

Citing *Forum Corp. v. Forum Ltd.,* 903 F.2d 434 (7th Cir.1990), Sun Life of Canada argues that this is an easy case simply because Sun Life of America is admittedly the junior user of a "Sun Life" mark. Sun Life of Canada contends that because Sun Life of America is a second comer, it has a continuing duty to avoid confusion with the first user's mark. Moreover, Sun Life of Canada presses, Sun Life of America's duty to avoid confusion exists even when the first user shortens or abbreviates its mark. In essence, Sun Life of Canada contends that Sun Life of America has acted at its peril since adopting a "Sun Life" mark in 1916.

The theory argued by Sun Life of Canada is legally cognizable, but only to a point. There is ample support for the proposition that a second user of a mark has a duty to avoid confusion with a first user's mark. In the words of Professor McCarthy:

> It is well-settled that one who adopts a mark similar to the mark of another for closely related goods acts at his peril and any doubt there might be must be resolved against him. If there is evidence that the junior user in fact knew of the senior user's mark before beginning use, the "acting at one's peril" rationale finds stronger support.

2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:21, at 106-07 (2d ed. 1984) (footnotes omitted). The second comer's duty to avoid confusion also requires the second comer to anticipate the possibility that the senior user will shorten or abbreviate its mark to its salient portions. For example, in *Forum Corp.,* the Seventh Circuit held the junior user of a mark responsible for avoiding confusion even though the senior user had abbreviated its name:

> It is the *second* user's responsibility to avoid confusion in

its choice of a trademark, and that responsibility must include choosing a mark whose salient portion would not likely be confused with a first user's mark....

....

... [E]ven if [senior user The Forum Corporation of North America] had shortened the form of its trademark throughout the years, [junior user The Forum, Ltd.] would not be freed from its responsibility to avoid confusion since the salient and memorable feature of [the senior user's] mark is "Forum."

903 F.2d at 440, 441; *cf. E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1531 (11th Cir.1985) (shortening REMY MARTIN to "Remy"); *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988) (shortening CENTURY 21 to "Century").

However, the duty to avoid confusion takes a different hue if the first user has actively permitted the second comer's use of a mark containing a salient portion of the senior user's mark. In other words, if the first user of a trademark affirmatively acquiesces to a second user's adoption and use of a mark that contains the memorable aspect of the first user's mark, the senior user cannot later complain that the second comer's mark creates confusion with an anticipated or actual abbreviation of the first user's mark. True, in *Forum Corp.,* senior user The Forum Corporation of North America could hold junior user The Forum, Ltd., accountable for the confusion resulting from the senior user's abbreviation to "The Forum," but only because the junior user had no permission or right to incorporate into its own mark the salient aspect of the senior user's mark. But The Forum Corporation of North America could not affirmatively acquiesce to a second comer's use of "The Forum, Ltd." and then change its own

name to "The Forum, Ltd." after an inexcusable delay accompanied by undue prejudice. [9]   *See supra* slip op. at [----] - [----]. Similarly, Remy Martin could not consent to another cognac's use of "Remy Smith" and then adopt for itself the name "Remy Smith," and Century 21 could not acquiesce to the use of "Century 42" only to later appropriate "Century 42" for itself.

Accordingly, if the junior user can establish the three requisite elements of an acquiescence defense, then the duty to avoid confusion becomes *mutual.*  Typically, where the senior user acquiesces to the junior user's mark, the senior user is estopped from challenging that mark under section 43(a) of the Lanham Act. It follows that the senior user should also be estopped from adopting the junior user's mark for itself and from changing its own mark in a manner that significantly heightens the risk of confusion.  After acquiescence, the senior user and the junior user must treat one another's marks with equal dignity.

In the context of this dispute, then, the fact that Sun Life of America is the junior user of a "Sun Life" mark is dispositive only if Sun Life of Canada has not acquiesced to the use of SUN LIFE OF AMERICA.  Absent Sun Life of Canada's affirmative acquiescence, Sun Life of America would have a duty to avoid confusion with Sun Life of Canada's mark, including the duty to anticipate both the shortening of SUN LIFE OF CANADA to SUN LIFE and the designation of Sun Life of Canada's subsidiary in America

---

[9]Again, this discussion must always be viewed against the backdrop of the likelihood of confusion determination, which necessarily involves an analysis of the seven-factor test; including, for example, similarity of products, channels of commerce and advertising media.

as SUN LIFE (U.S.).  If Sun Life of Canada has acquiesced to the use of SUN LIFE OF AMERICA, however, Sun Life of Canada also has a duty to respect that mark and avoid creating confusion with it. Once again, I express no opinion on the acquiescence defense.  As this issue will require a careful, fact-intensive consideration, I shall leave it for the district court and its informed discretion on remand.  *See ConAgra* [*Conagra* ], 743 F.2d at 1518.

## III.

Because the majority has vacated the permanent injunction for the reasons stated above, I need not review the specifics of the district court's resolution of SunAmerica's challenge to Sun Life of Canada's use of SUN LIFE (U.S.).  However, my review of the record again indicates the need for doctrinal guidance and the necessity of a methodical approach.

The starting point for the analysis of the claim that SUN LIFE (U.S.) is confusingly similar to SUN LIFE OF AMERICA is, once again, whether or not SunAmerica can establish a prima facie case under section 43(a) of the Lanham Act.  As indicated above, the case law requires SunAmerica to establish (1) that it has a protectible trademark interest in SUN LIFE OF AMERICA, and (2) that Sun Life of Canada's use of the mark SUN LIFE (U.S.) creates a likelihood of confusion with SUN LIFE OF AMERICA.  With respect to the first element, SunAmerica must not only survive Sun Life of Canada's counterclaim, *see supra* slip op. at [----], but also establish the acquisition of protectible trademark rights, either because SUN LIFE OF AMERICA is inherently distinctive or because it has acquired secondary meaning. *See Investacorp,* 931 F.2d at 1522.

With respect to confusion, the district court's analysis should again follow the seven-factor test as established in cases like *Dieter* and *Jellibeans* to determine whether or not Sun Life of Canada's use of SUN LIFE (U.S.) creates a likelihood of confusion with SUN LIFE OF AMERICA.

I think it also prudent to address Sun Life of Canada's "causation" argument. Sun Life of Canada argues repeatedly on this appeal that the "cause" of public confusion (if any) is not its use of SUN LIFE (U.S.), but the combination of SunAmerica's use of a mark that begins with "Sun Life" and SunAmerica's relatively recent entrance into the business of selling annuities through broker-dealers. Sun Life of Canada is certainly correct in pointing out that the only reason the change in geographical designation might make a difference is that in this case, both parties have operated under names that begin with "Sun Life."

Nevertheless, historical similarities occasioned by the parties' dual use of "Sun Life" would not necessarily disqualify Sun Life of America from obtaining an injunction. Should the district court find it necessary to reach the issue of whether or not SUN LIFE (U.S.) is confusingly similar to SUN LIFE OF AMERICA, it will only be because there has been a prior finding that SunAmerica has a protectible trademark interest in SUN LIFE OF AMERICA and that Sun Life of Canada has acquiesced to that interest. At such a point, SunAmerica's mark and Sun Life of Canada's mark would stand in parity. Under these circumstances, even if Sun Life of America then took advantage of industry trends by shifting to the sale of annuities through broker-dealers, it

would be entitled to assume that no party would take further steps that would generate a greater likelihood of confusion than that which previously existed at the time of acquiescence. Therefore, if SunAmerica has enforceable rights in SUN LIFE OF AMERICA, it is not fatal to SunAmerica's claim that a "but-for" cause of public confusion might be SunAmerica's expansion into annuity products and the broker-dealer markets, or that there may have been residual similarities stemming from the parties' respective uses of "Sun Life" for 75 years. As long as the district court finds, based upon a careful analysis of the evidence, that Sun Life of Canada's use of SUN LIFE (U.S.) now creates an *additional* likelihood of confusion, an injunction will lie.[10]

Finally, after resolving the issues raised by Sun Life of Canada's counterclaim and reaching a decision as to whether SunAmerica can establish a prima facie case under section 43(a), the district court should consider the two affirmative defenses proffered by Sun Life of Canada—laches and acquiescence. The trial court may not have understood that Sun Life of Canada's affirmative defenses focus upon a different time period than SunAmerica's apparent defense to the counterclaim. Sun Life of Canada's defenses focus not upon the long history of the two companies, but upon the relatively shorter period of time that Sun Life of Canada has been utilizing the mark SUN LIFE (U.S.).

Sun Life of Canada first argues that SunAmerica should be

---

[10]Sun Life of Canada also contests the admissibility and authenticity of certain evidence before the district court. I express no opinion on this issue. I trust that on remand, the district court will ascertain that the evidence it considers is admissible and authentic.

estopped from contesting the use of SUN LIFE (U.S.) because SunAmerica had actual knowledge of the use of SUN LIFE (U.S.) in 1982, yet waited until June 1989 to file suit, after Sun Life of Canada sold 4 billion dollars of products under the SUN LIFE (U.S.) mark. Such delay, Sun Life of Canada contends, constitutes laches. To establish this defense, Sun Life of Canada must prove:

(1) a delay in asserting a right or a claim,

(2) that the delay was not excusable, and

(3) that there was undue prejudice to the party against whom the claim is asserted.

*Ambrit [AmBrit], Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1545 (11th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987). Stated differently, SunAmerica is only estopped from asserting its SUN LIFE (U.S.) claim if Sun Life of Canada demonstrates that it suffered undue prejudice while SunAmerica inexcusably delayed in asserting its rights. While I express no opinion on the laches argument, I anticipate that the district court will consider all of the relevant facts and circumstances before reaching a conclusion on this equitable defense.

Sun Life of Canada next alleges that SunAmerica should be estopped from contesting the use of SUN LIFE (U.S.) because SunAmerica implicitly acquiesced to the use of SUN LIFE (U.S.) by acting as an agent of Sun Life of Canada and selling Sun Life of Canada's products under the name SUN LIFE (U.S.). Put another way, Sun Life of Canada contends that by selling products designated by SUN LIFE (U.S.), SunAmerica implicitly consented to Sun Life of Canada's use of that specific mark (even if potentially confusing). To establish this acquiescence defense, Sun Life of Canada would

need to establish the three elements identified above: active representation, inexcusable delay, and undue prejudice. *See supra* slip op. at [----] - [----]. I note for the district court that an "active representation" need not come via a "specific endorsement" or formal agreement, *see* R15-137-16; rather, implied acquiescence may be inferred from a clear encouragement of the use of the allegedly infringing mark, as when, for example, the plaintiff substantially contributes to the marketing of the allegedly infringing products. *See, e.g., Coach House,* 934 F.2d at 1563-64; *ConAgra* [*Conagra* ], 743 F.2d at 1516-18; *Land O'Lakes, Inc. v. Land O'Frost, Inc.,* 224 U.S.P.Q. 1022, 1029-30 (TTAB 1984); *Hitachi Metals Int'l v. Yamakyu Chain Kabushiki,* 209 U.S.P.Q. 1057, 1067 (TTAB 1981). Once again, in deciding this issue, the district court should carefully consider SunAmerica's proffered reasons for its alleged acquiescence and delay. *See supra* slip op. at [----] - [----].

## IV.

SunAmerica has described this case as "open-and-shut" because Sun Life of Canada has allegedly used an identical mark for competitive products. *See* Appellees' Br. at 4 n. 2 (citing 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:3, at 56 (2d ed. 1984)). As evidenced by my discussion, I am unpersuaded as to that conclusion. This case has a complex and unique history that spans over 100 years. Both parties to this dispute have persuasive claims, counterclaims, and defenses. All are interrelated. All require not only a careful analysis of each party's trademarks, products, markets, clients, and distribution

channels, but also an analysis of how circumstances may have changed over time. Arguably, in this case, convergence has created competition and confusion. Only precise, step-by-step detailed analysis can illuminate an appropriate resolution that is capable of meaningful appellate review. To suggest otherwise ignores the complexity and subtlety presented in this case.